UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                                        )
UNITED STATES OF AMERICA                )
                                        )
v.                                      )           No. 18-cr-10238-GAO
                                        )
RICHARD POILLUCCI,                      )
                    Defendant           )           Leave to file granted on 2/7/2020
                                        )
_____ )

## RICHARD POILLUCCI'S SENTENCING MEMORANDUM
## (REDACTED COPY)

Richard Poillucci is an unassuming, self-made businessman, who never graduated from

high school and whose dreams of playing professional hockey were crushed by an unexpected

injury.  Without a formal education, Richard, through his hard work and determination, built a

successful business over the course of more than 40 years that provides not only for his family,

but also his sixteen employees.  As the 36 letters submitted to the Court describe in great detail,

Richard has displayed extraordinary compassion, generosity, and civic and charitable

commitment throughout his life.  Letter after letter detail a caring, supportive, deeply involved

father and grandfather, an empathetic and dependable friend to many, and a man who routinely

and regularly does good deeds, large and small, without an expectation of anything in return.

Now, Mr. Poillucci stands convicted of a serious criminal offense, which he readily

acknowledges and for which he has accepted full responsibility.  The issue before the Court is

what punishment fits the facts and circumstances of this case—what sentence is "sufficient, but

not greater than necessary," to meet the goals enumerated in 18 U.S.C. § 3553(a).  In the end, for

the reasons detailed below as well as those to be presented at sentencing, the defense respectfully

asks the Court to impose a sentence of probation with a four-month term of home confinement or, in the alternative, any combination of punishments the court deems necessary other than a sentence of incarceration.  Such a sentence will permit Mr. Poillucci, who is now 63 years old, to tend to his myriad of serious and well documented medical issues, permit him to continue his regular monitoring for ███████████, *see* PSR at ¶53 and 61, and to continue to work and provide for his family and his employees.  It will also properly take into consideration the aberrant nature of Richard's conduct, his efforts to take responsibility and correct his mistakes, his paying not only the entire amount of restitution but also all penalties and interest owing from the tax violations at issue, *see* PSR at ¶ 14, and his impressive personal life arc.

### I.   <u>Relevant Background and Circumstances.</u>

#### A.   <u>*Personal and Family Background.*</u>

Richard Poillucci was born on February 13, 1956, in Boston, Massachusetts.  PSR at ¶39. His parents divorced when he was just three years old and while his father visited him as directed by court order, he never had meaningful contact with him during his younger years. *Id.*  Having suffered from learning disabilities, Richard left high school after the 10th grade and at age 17 he moved to Canada to play hockey. *Id.* at ¶50.  He was ultimately drafted by the Philadelphia Flyers, but due to a torn ligament, Richard's dream of playing in the NHL quickly ended.  *Id.*at ¶¶50 and 68.  He came back to Massachusetts at the age of 20 without an education or a career. Around that time, he met and married his soulmate, Donna.  *See* Letter of Donna Poillucci, attached hereto as Exhibit 2 ("Richard and I have been soul mates since the day we meet, and our love for each other has grown immensely and continues to grow every day. Although we have had our share of good and bad, with the grace of God we continue to move forward and embrace the love we have for each other.").  The marriage resulted in two loving children – Danielle and

Anthony – and while Donna managed the household, Richard worked long hours to financially support the family.  *Id.*

When Danielle was just born, Richard started his current auto body shop, Automotive Specialties, Inc. ("ASI").  He had no business knowledge, capital or support.  Despite these difficulties, Richard worked hard to make sure the business was a success and his family was provided for:

> My father worked very hard starting Automotive Specialties Inc so he could support his family and make sure growing up we were able to fulfill and achieve our goals … He started the company by one day going to the same location that has been there for the past 41 years …. He was going there to get his Motorcycle fixed and when he arrived they where moving locations and the owner of the bike shop asked my father if he wanted the space. My father was not well established at the time having a 1 year old at the house and a Wife (My Mother) he had $2,000.00 in the bank and took a HUGE risk taking this location…. [At the time he did not have] a clue on what he was doing but took the time to figure everything out and working 7 days a week to make sure he did whatever he needed for his Family.

Letter of Anthony Poillucci, attached hereto as Exhibit 3; *See also* Letter of Danielle Poillucci, attached hereto as Exhibit 4 ("My dad started his company, Automotive Specialties Inc, in 1978, the same year I was born. As my father was very busy starting a business to support himself and his family my mother was a stay at home mom. Three years later my brother Anthony was born. As my dad worked day in and day out my mother continued to stay home with us kids and help my dad with his business. My dad worked whatever hours he had to until the job was done. I very rarely saw my dad as I was in bed when he would arrive home from working all day and night."); Exhibit 2 ("Richard never completed high school and took a chance and started Automotive Specialties over 40 years ago.").   Forty years later, Richard's hard, tireless work paid off.  He grew ASI to employ sixteen people and created one of the few Audi-certified body shops in the Commonwealth of Massachusetts.  *See* Letter of Richard Poillucci, attached hereto

as Exhibit 1.   He is respected by his workers, who he treats like family and who can always

count on his assistance in their time of need:

> The strong family values he upholds and the willingness of him to go above and
> beyond for not only his family but also us as his employee's speaks volumes of the
> kind of man he is.
>
> I, Myself have been in the Autobody Industry for over thirty years and upon
> meeting Rich I got the immediate impression he was a man of his word. He has
> lived up to and far surpassed any expectations I have had. I have had many bosses
> in my career but not one that I respect more than Rich. Rich goes out of his way to
> make you feel like you're a part of his family not just an employee, whether it is a
> pat on the shoulder to say hello, or a pep talk if he knows your having a bad day.
> Rich treats everyone equal and with respect in his shop, which speaks very highly
> of his character.
>
> In closing, I would simply say that Richard Poillucci is the kind of man I personally
> strive to be and that I hope one day my sons are able to become.

Letter of James Meroli, attached hereto as Exhibit 5.

> I have grown to know him as a kind, caring, and generous man. I look forward to
> coming to work and being able to spend the majority of my day surrounded by a
> man who is happy to have himself in mine and my co-worker's presence. Rich
> always leaves his office door open, something that I love, as I always feel welcome
> to discuss anything with him, whether it be work related or personal issues. I am
> confident that if I ever needed a helping hand I could reach out to Rich and know
> that he will aid me in whatever I needed. While working with Rich, I have gone
> through my own type of personal issues and he has never been less than
> understanding as I worked through these problems. He allowed me to take time
> when I needed it to cope and guided me through any issues I was unsure of
> navigating through. He has been nothing less than a father figure to me as I have
> received amazing advice from Rich regarding any and all types of issues. He has
> always been kind to my children and has showed care as he has helped me with
> situations regarding my children. Even after many years of working with Rich, I
> continuously am amazed by his selflessness and willingness to help his employees
> and family.

Letter of Kim Wynn, attached hereto as Exhibit 6; Letter of Edwin Arce, attached hereto as

Exhibit 7 ("He has helped me and my family to grow over the years. In 2002 I had a situation

and needed a personal loan, which Rich provided me with. When I need a car loan and a

mortgage, Rich assisted me with information and guidelines as to how to obtain the loans.

Without Rich's help I would have been lost."); *See* Additional Letters from Employees and Customers, attached hereto as Exhibit 27.

Even with the demands of starting and growing a business and the burdens of his own issues with health, Richard remains a pillar of support for his family, friends, and his community. Exhibit 2.  As his wife Donna recalls from their forty-plus years of marriage, Richard "has put his heart and soul into everything he does, from coaching youth hockey, running fund raisers, helping friends and family to making sure his marriage and family were always first and most important." Exhibit 2.  He never missed his childrens' school and extracurricular activities.  *See* Exhibit 4 ("Even though my dad was busy running a new company he never missed any of my sporting events.").  He used his hockey talents to coach his son's team and, after his son graduated, he stayed on as a coach in order to give back to the kids and the community:

> Rich coached my youngest son in our home league. He was an inspiring coach due to the fact he would take the lowest team (level b or c) and because of his love for the kids and the sport, he would do an amazing job. He treated each child the same no matter if one was more talented than the other. Not only did Rich dedicate his time as a coach he would also take the time and bring his family to our family cook outs, the kids school shows and much more.

> Later in the years I became the director for the Stoughton High School hockey team. I had asked Rich to be the head coach for the SHS summer league, because of his knowledge and grace with the kids (young men). He did an awesome job again. I received a phone call from the school bookkeeping department and I was made aware that Rich didn't want the pay check for the coaching job, and that he had donated it to the SHS hockey team instead. He is a class act in my book. Always has been.

Letter of Jake Foley, attached hereto as Exhibit 8.

> Richie has taught me a lot about the kind of father I wish to be. He is always there for his children and grandchild. He coached hockey when his son was younger, devoting countless hours to the team and developing young athletes. He went on to coach other teams that his son didn't play on because he was committed to the program and wanted to give back.

Letter of Brian Statkiewicz, attached hereto as Exhibit 9; *see also* Letter of Debbie Quollete, attached hereto as Exhibit 10.

Richard's work as a coach had lasting impacts on the kids and their parents. *See* Letter of Frank and Rosemary, attached hereto as Exhibit 11 ("The emotion you brought to the ice was always transferred to the boys. I've seen the boy mature on and off the ice especially my Matt. Your constant awareness of Matt[']s abilities [and] keeping him on his toes has even helped him at the high school level this year. A mere thank you can never be enough for all you have done for Matt as a player and as a young man."); Letter of Karen Walsh, attached hereto as Exhibit 12 ("[T]hank you for teaching Kevin to work hard and also to have fun, to be aggressive yet to show self-control and discipline, to strive for his best and also to be a team player. These qualities, along with your caring, trust, and guidance has left an impression on Kevin which will help him grow into a responsible young adult. Thanks for taking the time to get to know Kevin and believing in him. He holds you in high regard and respects you as a coach and friend."); Letter of Matt Robles, attached hereto as Exhibit 13 ("you made me have a lot of fun. You taught the team well. You had a big impression on my life on and off the ice. I would just like to thank you and tell you, you are the best. I have had a lot of coaches to which I had a lot of respect for. But you, in my mind deserve the most."); Letter of Joe and Janet Demaggio, attached hereto as Exhibit 14; Letter of Alfred and Mary Oswards, attached hereto as Exhibit 15; Letter of Debbie Conville, attached hereto as Exhibit 16.

In every instance, Richard has gone above and beyond to assist others in their time of need.  One parent recalls how Richard dropped everything in order to help her son during a bout of depression:

My son Matthew suffered from depression and anxiety during this time in his life. Hockey was his passion, and this helped keep him grounded, and focused, however,

> I recall a particular period when he could not eat. I cooked a turkey dinner, to entice him to eat, and I asked his favorite family, the Poilluccis to please join us for dinner.
>
> At this point in time, Rich was in the process of building his house, and had a night of meetings scheduled with various contractors. I will never forget how he cancelled his meetings and he and his wife and children came to my house to help cheer Matthew up. This may sound like a very silly thing to be grateful for, but my husband and I will never forget how he dropped everything in order to help my son recover. This was just the type of man Rich was, and is. A very loyal and caring friend.

Letter of Susan Fors, attached hereto as Exhibit 17.  When Kathy Sampson's grandson was diagnosed with leukemia, Richard jumped into action fundraising so that the family could receive the best possible care at Mass General Hospital.  Letter of Kathy Sampson, attached here to as Exhibit 18; Letter of Deborah Valler, attached hereto as Exhibit 19.  Richard and Donna "made sure that whatever [her] grandson needed he got…. He also made sure that [her] daughter had money for food and lodging and transportation so she could be with her son.  This generosity continued over a span of 18 months."  *Id.*

 In a world today where many people do not even know their neighbors, Richard is the kind of person who actually goes out of his way to help. *See* Letter of Richard Kellstrom, attached hereto as Exhibit 20 ("Rich was the only person who came to introduce himself. He could probably see the fact I was in over my head. I knew nothing about how campers work. The first time I met him he walked over and handed me what looked like a normal garden hose. He told me that the drinking hose connected to the trailer was no good. He told me to replace it with a spare one he had."); *see also* Letter of Samantha Kellstrom, attached hereto as Exhibit 21. When a teacher needed school supplies, Richard stepped in with a donation. *See* Letter of Carolyn Glynn, attached hereto as Exhibit 22.  In short, Richard has made a habit of quietly helping those in need (asking for and expecting nothing in return), steadfastly offered the kind of friendship any person would cherish, and provided an unwavering foundation of support and care

to his family, his friends, and many more.  *See* Letter of Laura Poillucci, attached hereto as

Exhibit 23; Letter of Paul Maranian, attached hereto as Exhibit 24 ("His commitment to his

friends [is] unwavering. He has a heart of gold and is a true life saver to many people including

myself. Rich has touched so many lives in so many ways. His soft spoken. words of wisdom,

have helped solved many problems and issues over the years, helping numerous people from all

walks of life get through their troubling times."); Letter of Robert Poillucci, attached hereto as

Exhibit 25 ("My uncle has given countless people help in life, given them opportunities they

would not have had, advice when needed [and] even financial help when people needed [it].");

Letter of David Davidian, attached hereto as Exhibit 26 ("Richard became my mentor, my idol,

always pushed me forward to do be better and do better"); *see also* Additional Letters, attached

hereto as Exhibit 28.

      Sadly, Richard has also experienced substantial medical and physical hardship. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████).  Furthermore, even with grown children, Richard is still the principal financial

caretaker of the family.  His son works for ASI, but is unable to replace Richard's involvement:

"the heart of the business is still my father and its success depends on his involvement and daily

management. The business simply would not exist if it wasn't for him. He manages all of its

aspects: from client relationships and manufacture certifications to physically doing the appraisement and adjustments for clients' vehicles. No one can replace the 40 years of blood, sweat, and tears that my father has put into this place." Exhibit 3; *see also* Exhibit 2.  Richard, alone, is trained and certified by Audi to repair their vehicles, which accounts for approximately 80% of his collision business. Exhibit 1. His absence would risk that certification and the continued viability of ASI, *see infra*.  Danielle is a professional hairstylist, however, she still relies on Rich and Donna for financial support. PSR at ¶52. Moreover, Danielle's son, Anthony, lives with Richard and is presently in the legal custody of Richard and his wife.  PSR at ¶54; Exhibit 4.

   B. *Health Background*

███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████████████████

█████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████

C.  *Acceptance of Responsibility.*

Unlike many other criminal defendants, Richard has not sought to justify or excuse his

offense.  Since almost the inception of the Government's criminal investigation, Rich, through

his counsel, worked with the IRS to determine an accurate tax liability, waived his right to an

Indictment, and agreed to plead guilty to an Information.  He continues to take full and

unqualified responsibility for his conduct:

> I would like to personally apologize to this court. I made a mistake and I have taken
> full responsibility for it in every way I know how including by paying back taxes,
> penalties and interest. I have had a perfect record for close to sixty four years. I
> have always wanted to help others and my family. In 1992 I had the misfortune of
> loosing an eye in an accident and in 2011 I had cancer. I am not sure any of that is
> as hard as this has been for me. Over the past 3 years I go to bed and wake up with
> this on my mind. I feel like the reputation I built has been ruined…. I have hurt my
> family. I feel terrible they have had to go thru this. I apologize to my wife, my
> children and my grandchildren, and I hope they will look at me the way they did in
> the past. Long after this is over I will still live with it, for the rest of my life.

Exhibit 1; *see also* PSR at ¶64. In their letters, friends and family members attest to Richard's

sincere acceptance of responsibility and contrition for his offense.  *See e.g.,* Exhibit 2 ("Richard

has taken full responsibility for this misfortune and there has never gone a day in the past 3 1/2

years that he hasn't expressed how truthful sorry he is. I know in my heart he is forever sorry and

I hope and pray that he can some day forgive himself.").  Additionally, Richard acted

expeditiously to pay the IRS for the back taxes, penalties, and interest owed. PSR at ¶14. Thus,

by word and by deed Richard has demonstrated his determination to take responsibility for his

misconduct and to begin making amends for it.

## II.     Legal Principles

### A.   *General Sentencing Framework*

With the Supreme Court decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall*

*v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007),

sentencing options available to district courts have significantly broadened. *See, e.g., United*

*States v. Taylor*, 532 F.3d 68, 69 (1st Cir. 2008). "[O]nce the [guideline sentencing range

("GSR")] is properly calculated, 'sentencing becomes a judgment call' for the court, and the

court may construct a sentence varying from the GSR 'based on a complex of factors whose interplay and precise weight cannot even be precisely described.'" *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (quoting *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008)). To the extent there exist "sound, case-specific reasons" to do so, a sentencing court is authorized to deviate from the guidelines. *Martin*, 520 F.3d at 91. The post-*Gall* sentencing inquiry is "broad, open-ended, and significantly discretionary." *Id.* at 92.

### B.   *The Court should impose a non-custodial sentence.*

"Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012). What sentence should be imposed ultimately involves a complicated analysis of the individual involved: what punishment has already been inflicted, are they likely to engage in recidivist behavior, have they been rehabilitated or are they particularly receptive to rehabilitation, and whether incarceration will significantly further the goals of sentencing.  It is a complex matrix of factors, ultimately dependent upon the individual human being at issue, which is precisely why our criminal justice system has vested this Court with discretion to differentiate and individualize sentencing.  For all of the following reasons, the defense respectfully submits that a sentence of probation with four-months home confinement or, in the alternative, any combination of punishments the court deems necessary other than a sentence of incarceration constitutes a fair and just sentence in this case, *i.e.*, one that is "sufficient, but not more than necessary," to meet the sentencing goals enumerated in § 3553(a).  *See United States v. Brady*, 02 Cr. 1043 (JG), 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (probation "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory

purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."); *see also United States v. Coughlin*, No. 06-20005, 2008 U.S. Dist. LEXIS 11263, at *20-22 (W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive." Recognizing that white-collar offenses are "gravely serious and demanding of considerable punishment," the court found that probation and home detention could accomplish the goals of punishment "more effectively than imprisonment" and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished.").

First, Mr. Poillucci is a first-time offender, having never before been convicted of a crime. From a sentencing perspective, this is important. As Judge Gertner noted in *United States v. Germosen*, there is "a demonstrable difference in the recidivism rates of real first-time offenders as compared to other defendants in Criminal History Category I." 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citation omitted). The Sentencing Guidelines, recognizing this fact, now direct courts to "consider imposing a sentence other than a sentence of imprisonment" for certain first-time offenders. U.S.S.G § 5C1.1. Application Note 4.[1]  Furthermore, when the offense of conviction is an extreme departure from an otherwise well-led life and there is no likelihood of re-offense, a variance and a non-incarceratoy sentence may be warranted. *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an 18 - 24 month guideline range, where appellate court construed district

---

[1] Application Note 4 directly applies when the applicable guideline range is in Zone A or B of the Sentencing Table, *i.e.,* to Guideline Offense levels between 1 and 11 with a Criminal History Category I.  Mr. Poillucci's guideline range, as calculated by Probation, is marginally higher at 13 and falls within Zone C of the Sentencing Table.

court to have termed the offense an "isolated mistake" in the context of Defendant's otherwise long and upstanding life). The defense respectfully contends that such variance is warranted here. Mr. Poillucci is an esteemed member of his community with a well-earned reputation for honesty in both his professional and personal lives. For over forty years he excelled in his profession through integrity and hard work. Indeed, Mr. Poillucci's word is his bond – a principle that he lives by and one that he has instilled in his kids.

Second, a sentence of confinement, even for a short period of time, risks Mr. Poillucci's wellbeing and the worsening of his existing, reoccurring medical conditions, including ██████

Phillip S. Wise spent his career in various prison administrative positions and eventually as a Warden of several large U.S. Bureau of Prisons (BOP) facilities, including the Federal Medical Center in Rochester, Minnesota. Mr. Wise also participated in the formulation of BOP health care policy as a member of the agency's executive staff in Washington, D.C and is aware of the current BOP health care policies and practices. *See* Phil Wise Declaration, attached hereto as Exhibit 33.

Based on his review of Mr. Poillucci's current medical conditions and his treatment requirements, Mr. Wise believes that Mr. Poillucci would be unable to receive some or all of the care that he needs through the BOP. *Id.* First, any treatment that Mr. Poillucci receives for ██ ████████████████████████████████████████ would not be provided by the BOP. *Id.* Such treatment, according to Mr. Wise, has never been approved by the BOP in his 25 years of experience. Second, while the BOP could provide monitoring for ████████████████████████████████, based on Mr. Wise's observations are not staffed with specialists that have a particularized expertise in diagnosing and treating ████████ Instead, these clinics are staffed "by mid-level provider such as a physician

assistant, nurse practitioner, or unlicensed foreign medical graduate[s]." *Id.* Furthermore, these clinics are understaffed and there is no assurance that the monitoring that Mr. Poillucci so desperately requires would be provided. *Id.* Indeed, Mr. Wise had a troubling recent experience in a different case, where a defendant diagnosed with ████ r did not receive any of the treatment he required for nearly six months (up until the point he was compassionately released) despite multiple requests to the BOP. *Id.*

In sum, there can be no doubt that, due to Mr. Poillucci's medical needs, a prison sentence, even of a short duration, has the potential to worsen Mr. Poillucci's existing medical conditions and to fail to monitor for the threat of new ones.

Third, Mr. Poillucci has already suffered severe collateral consequences as a result of this criminal case. As Mr. Poillucci details in his letter, since the publication of this case by the media revenue dropped nearly 25%. Exhibit 1. ASI lost customers and a business contract with a major U.S. based car manufacturer. These circumstances alone support a downward variance. *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (sentencing court properly considered fact defendant's loss of "his teaching certificate and his state pension" as reasons justifying a variance); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (destruction of a defendant's career and livelihood is "substantial punishment" that lessens the need for further punishment); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (loss of defendant's business, assets, and income "constitutes a source of both individual and general deterrence").

Moreover, irreparable further damage could result to the business and the family's principal source of income in the event of Mr. Poillucci's incarceration.  As numerous letters attest, Rich is the heart and soul of ASI.  He is the only individual who manages the used-car side of the firm and is the only one who is certified by Audi to run the shop.  The Audi-certification, which requires Rich's availability to undergo training sessions and to ensure compliance with Audi's specifications, is the principal source of income to ASI.  If Rich is unavailable or if his unavailability is heavily publicized, Audi could potentially withdraw Rich's certification and with it most of ASI's income generating business opportunities.  A term of imprisonment for Mr. Poillucci, as ASI's owner, once publicized, could result in a loss of customers, a loss of referral sources, and even a loss of certification which would imperil more than 40 years of hard work and cripple the Poillucci family and the families of sixteen employees, who naturally rely on ASI to support themselves and their families.

Finally, the probationary sentence advanced herein would be consistent with, rather than disparate from, sentencing from a broader, national perspective. The Sentencing Commission provides a metric for "Offenders Receiving Sentencing Options in Each Primary Offense Category" or "Sentence Type by Type of Crime."  In 2018, 32.2% of those sentenced for tax offenses were sentenced to probation. Out of the 186 individuals sentenced to probation, 124 received probation only, while 62 received probation and home confinement. Again, this is not an anomaly. In 2017, 36.2% of those sentenced for tax offenses received probation rather than prison, with 22.5% receiving probation without home confinement. In 2016, 40% of tax offenders were sentenced to probation, with 28.1% receiving probation without home confinement. *See e.g.,* U.S.S.C. Statistical Information Packet, Fiscal Year 2018, Table 4.

Indeed, courts have routinely imposed non-custodial sentences in tax fraud cases where

the offense conduct was similar or even substantially *more* serious than that at issue here or where medical circumstances warranted the imposition of a non-custodial sentence:

| CASE | GSR | SENTENCE | SUMMARY |
|---|---|---|---|
| *United States v. Le*, 17-CR-10069 (D. Mass.)<br><br>(O'Toole, J.) | 37-46 | Probation with 12 months' home confinement | Defendant, the operator of a staffing agency, pled guilty to failure to pay employment taxes. Over a five-year period, the defendant caused more than $11 million in client checks to be cashed at a check cashing agency. After learning of the IRS investigation, the defendant took steps to destroy relevant documents. |
| *United States v. Sentner*, 09-CR-10099 (D. Mass.)<br><br>(Gertner, J.) | 24-30 | Probation with 6 months' home confinement | Defendant, an accountant, pled guilty to personally evading more than $200,000 in taxes, as well as preparing fraudulent tax returns for clients. He had failed to file personal tax returns since at least 1991. In imposing a non-incarcerative sentence, the court noted the defendant's health conditions and opined that even a probationary sentence would "wreak havoc" on his life. |
| *United States v. Sicard,* 14-cr-10011-GAO (D. Mass)<br><br>(O'Toole, J) | 18-24 | Probation with 4 months' home confinement | Defendant, a contractor, underreported income of $620,537, who because of an aggressive stance against the IRS during a civil audit was referred for criminal prosecution. In imposing a non-incarcerative sentence, the court noted that home confinement would adequately address the Government's deterrence concern and would allow the defendant to earn money to pay his restitution obligations. |
| *United States v. Molloy,* 16-cr-10212-GAO (D. Mass)<br><br>(O'Toole, J) | 18-24 | Probation | Defendant, an attorney, concealed in excess of $1 million in income from the IRS, which sustained a tax loss of $332,019. Defendant took responsibility, cooperated with the Government in a separate investigation, and already suffered adverse |

| | | | collateral consequences. |
|---|---|---|---|
| *United States v. Tutunjian,* 16-cr-10225 (Woodlock, J) | 24-30 | Probation with 18 months' community confinement | Defendant caused a tax loss of $739,204 as a result of payroll fraud. Court imposed non-incarceratory sentence in part due to Defendant's medical needs. |
| *United States v. Warner*, 13-CR-731 (N.D. Ill.) (Kocoras, J.) | 46-57 | Probation | Defendant, the billionaire CEO of Ty Inc., pled guilty to tax evasion for failing to report income held in foreign bank accounts. The unreported income totaled almost $25 million over thirteen years. |

Accordingly, the sentence advocated for herein – a term of probation with four months' home confinement – would be consistent with sentences imposed on similarly situated defendants in this district and nationwide.

## III.   Conclusion

The defense respectfully requests the Court to impose a sentence of probation with four months' home confinement, or, in the alternative, any combination of punishments other than a custodial sentence. Such a sentence can include a combination of home confinement, community service, and fines, and would adequately serve all the purposes of sentencing, including general and specific deterrence. Indeed, there is certainly no reason to believe that there is any risk that Mr. Poillucci would reoffend. Mr. Poillucci has been living under the stress caused by his conduct for nearly three years. He has paid $427,211 in back taxes, interest and penalties to the IRS. He is also in the process of paying an additional $62,000 to the Massachusetts Department of Revenue in accordance with an agreed-upon payment plan. The defense respectfully contends that the sentence advocated for herein would fully satisfy the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, and achieving general deterrence, with the added value of allowing

Mr. Poillucci to continue his medical treatment and to continue his indispensable work at his

business of more than 40 years.

Respectfully Submitted,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
Dated: January 17, 2020        owlmgw@att.net

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, January 17, 2020, a copy of the foregoing documents has been served, via ECF, upon all registered participants, including Assistant U.S. Attorney Sara Bloom.

**/s/ Martin G. Weinberg**
Martin G. Weinberg